**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street – Suite 1201
Newark, New Jersey 07102
Telephone: 973-623-3000
Facsimile: (973) 623-0858
Email: bgreenberg@litedepalma.com
*Attorneys for Plaintiff*
[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANET TUCCI, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) ) **CLASS ACTION COMPLAINT** |
| THE TORONTO-DOMINION BANK, BHARAT B. MASRANI, RIAZ E. AHMED, and COLLEEN M. JOHNSTON, | ) **JURY TRIAL DEMANDED** ) ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiff Janet Tucci ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding The Toronto-Dominion Bank ("TD Bank" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that

1

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired TD Bank securities between December 3, 2015 and March 9, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      The Toronto-Dominion Bank conducts a general banking business through banking branches and offices located throughout Canada and overseas. The Bank and other subsidiaries offer a broad range of banking, advisory services, and discount brokerage to individuals, businesses, financial institutions, governments, and multinational corporations.

3.      Founded in 1855, the Company is headquartered in Toronto, Canada. TD Bank's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TD."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's wealth asset growth and increased fee-based revenue was spurred by a performance management system that led to its employees breaking the law at their customers' expense in order to meet sales targets; (ii) the Company illicitly increased customers' lines of credits and overdraft protection amounts without their knowledge; (iii) the Company illicitly upgraded customers to higher-fee accounts without permission; (iv) the Company lied to customers as to

2

the risk of the Company's products and services; and (iv) as a result of the foregoing, TD Bank's public statements were materially false and misleading at all relevant times.

5.     On March 6, 2017, *CBC News* first reported about the pressures put on TD Bank branch employees for products they do not need. *CBC News* interviewed several TD Bank Group employees, who spoke about the "incredible pressure" to "squeeze profits from customers by signing them up for products and services they don't need."  The report stated in relevant part:

> Go Public [CBC News Public Forum] has heard from TD tellers in several Canadian cities who say they quit their jobs because the pressure to push products was so extreme.
>
> ***"I was made to feel as if I was committing a huge wrong for looking out for the best interests of my customer over the interests of the bank," says Dalisha Dyal, who worked as a TD teller in Vancouver for four years.***
>
> Another TD teller says the relentless pressure to meet sales numbers is so severe, the teller is currently on a medical leave.
>
> **Teller screens highlight potential sales**
>
> The three bank employees who initially contacted Go Public explained how tellers upsell customers: when a customer keys in a PIN at the teller counter, a gold star lights up on the teller's computer screen, indicating that "Advice Opportunities Exist."
>
> When a teller clicks on the star, products and services the customer hasn't purchased pop up, such as overdraft protection, credit card or line of credit.
>
> Each time a teller gets a customer to sign up for one of those options, it counts towards meeting their sales targets.
>
> "Customers are prey to me," says the teller. "I will do anything I can to make my [sales] goal."
>
> ***
>
> The TD employees say elderly customers are a common target because they've grown to trust their tellers over the years.
>
> "There are elderly customers who have fought for us — they have an army pension," says the teller. "And here I am, setting them up with all these service fees and they don't have a clue what's going on."

3

Both the managers sometimes work the front counter and say there's a big push by their branch manager to sign up people for overdraft protection, so sometimes clients with large balances get it, too.

"Customers pay enough in service charges," says one manager. "They shouldn't have to worry ... 'What has my teller added to my profile today?'"

**'More pressure on us'**

***"The higher-ups are also putting more pressure on us to get tellers to achieve these goals," says the other manager.***

"And if they don't … our job is to make sure that they understand that they're no longer right for this job."

"I feel bad for what they're making me do," she says.

***When the managers expressed concerns to their branch manager and district vice-president, they say they were asked to consider whether they were still "a good fit" for the job.***

Documents obtained by Go Public show tellers who fail to reach their sales goals are called "underperformers" and placed on a "Performance Improvement Plan," which involves daily coaching and monitoring by managers. If sales performance doesn't improve, employees are warned "employment could be terminated."

(Emphasis added.)

6.     On March 10, 2017, *CBC News* published a more detailed second report, where it

reported that hundreds of current and former employees responded to the first CBC report with

stories of pressure to upsell customers, stating  in relevant part:

Hundreds of current and former TD Bank Group employees wrote to Go Public describing a pressure cooker environment they say is "poisoned," "stress inducing," "insane" and has "zero focus on ethics."

***Some employees admitted they broke the law, claiming they were desperate to earn points towards sales goals they have to reach every three months or risk being fired. CBC has agreed to conceal their identities because their confessions could have legal ramifications.***

TD insists all its employees are to follow the company's code of ethics, but many employees who contacted Go Public said that's impossible to do given the sales expectations.

*"I've increased people's lines of credit by a couple thousand dollars, just to get SR [sales revenue] points," said a teller who worked for several years at a TD branch in Windsor, Ont.*

*He admits he didn't tell the customers, which is a violation of the federal Bank Act.*

*Another teller with over 20 years' experience at an Ontario TD branch said she has increased customers' overdraft protection amounts without their knowledge, and increased their TD Visa card limits on the sly — all to earn units towards her sales revenue target.*

Many TD workers wrote to say they are on medical leave, suffering from anxiety and/or depression because of the constant pressure to upsell customers.

One teller on sick leave described how a manager stood behind her three times a day, pushing her to sell more.

"They just really stress you out and say, 'You're not doing good. I need you to do double the amount you've been doing.' I couldn't sleep. I'd be thinking … 'What can I do tomorrow to try and get sales?'"

*She admits to upgrading customers to a higher-fee account without telling them.*

"Because that gives us sales revenue. And the customers don't have to sign for it."

**'I wouldn't have noticed the $29.95'**

Bev Beaton believes she's been a victim of a TD teller desperate to generate sales revenue.

In January, she noticed a service charge on her account for $29.95. When she called TD to ask about it, she was told it was because she was in an account that required her to keep a minimum monthly balance of $5,000 or she would be charged that monthly fee.

*"I said, 'I did not ask for this account. There's no way I would have asked for this account.' And [the bank employee] said, 'You must have.'"*

When Beaton checked her statements, she saw that she'd been moved to the higher-fee account last May, but only noticed when her balance dropped below $5,000 for the first time in December and she was hit with the service charge.

"I was very annoyed," Beaton said. "And I think it's dishonest. Because if I wasn't looking at my statement closely, I wouldn't have noticed the $29.95."

**Financial advisers also admit deceit**

***TD employees tell Go Public the pressure to deceive customers extends beyond front-line staff to workers handling wealth management.***

"We do it because our jobs are at stake," said one financial adviser in Ontario.

She admits she acted in her own interest rather than that of her clients after being put on a Performance Improvement Plan — a program that involves coaching and could result in termination of employment — because she wasn't meeting her sales targets.

***"I have invested clients' savings into funds which were not suitable, because of the SR [sales revenue] pressure," she said.*** "That's very difficult to admit. I didn't do this lightly."

**'I was forced to lie to customers'**

A former TD financial adviser in Calgary says he would downplay the risk of products that gave him a big boost towards his quarterly goal.

***"I was forced to lie to customers, just to meet the sales revenue targets," he said.***

***"I was always asked by my managers to attach unnecessary products or services to the original sale just to increase the sales points — and not care if the customer can afford it or not."***

A financial adviser who worked for six years in Nanaimo, B.C., before quitting says "people eventually snap, or lose all sense of themselves and do anything to close sales."

"I have had multiple conversations with branch and district managers. These conversation lead to my being asked if I was still the right fit for the job."

**Employees must abide by code of ethics: TD**

In statement provided to Go Public, TD spokesperson Daria Hill wrote every employee must "act ethically and ... not allow a focus on business results to come before our focus on customers."

In an internal letter written to TD employees and obtained by Go Public, Andy Pilkington, executive vice-president of branch banking, wrote, "We don't believe the [CBC] story is an accurate portrayal of our culture," but said the report was an opportunity "to pause, reflect and ask ourselves ... how we can do better for our people and our customers."

One TD teller balked at Pilkington's letter, sending an email to Go Public that says, "Maybe if they stood back for a moment and thought about how they have put so much pressure on employees (with ridiculous sales goals) they wouldn't be in this situation right now!"

(Emphasis added.)

7.      On this news, TD Bank's share price fell $2.74, or 5.29%, to close at $49.03 on March 10, 2017.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.     Venue is properly laid in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  TD Bank's U.S. headquarters are located within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff is a citizen of Ontario, Canada.  As set forth in the attached Certification, Plaintiff acquired TD Bank securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant TD Bank is incorporated in Ontario, Canada.   The Company's principal executive offices are located at Toronto-Dominion Centre, King Street West and Bay Street, Toronto, Ontario M5K 1A2, Canada, and its U.S. headquarters are located at 1701 Marlton Pike E., Cherry Hill, New Jersey 08034.  TD Bank's shares trade on the NYSE under the ticker symbol "TD."

15.     Defendant Bharat B. Masrani ("Masrani") has served as the Company's Chief Executive Officer ("CEO") and President since November 1, 2014.

16.     Defendant Riaz E. Ahmed ("Ahmed") has served as the Company's Chief Financial Officer ("CFO") since January 2, 2016.

17.     Defendant Colleen Johnston ("Johnston") served as the Company's CFO from November 1, 2005 until January 2, 2016.

18.     The defendants referenced above in ¶¶ 15-17 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     The Toronto-Dominion Bank conducts a general banking business through banking branches and offices located throughout Canada and overseas. The Bank and other subsidiaries offer a broad range of banking, advisory services, and discount brokerage to individuals, businesses, financial institutions, governments, and multinational corporations.

### Materially False and Misleading Statements Issued During the Class Period

20.     The Class Period begins on December 3, 2015, when TD Bank filed an annual report on Form 40-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended October 31, 2015 (the "2015 40-F").  For the quarter, the

Company reported net income of $1.81 billion, or $0.96 per diluted share, on revenue of $8.04 billion, compared to net income of $1.71 billion, or $0.91 per diluted share, on revenue of $7.45 billion for the same period in the prior year.  For 2015, the Company reported net income of $7.91 billion, or $4.21 per diluted share, on revenue of $31.42 billion, compared to net income of $7.77 billion, or $4.14 per diluted share, on revenue of $29.96 billion for 2014.

21.     In the 2015 40-F, the Company stated, in relevant part:

**Business Conduct and Ethical Behaviour**

The Committee shall monitor compliance with policies in respect of ethical personal and business conduct, including the Bank's Complaint-Handling and Disclosure of Information to Customers Policy; Anti-Bribery and Anti-Corruption Policy; and Code of Conduct and Ethics and the conflicts of interest procedures included therein, including approving, where appropriate, any waiver from the Bank's Code of Conduct and Ethics to be granted for the benefit of any director or executive officer of the Bank.

**Compliance**

The Committee shall oversee the establishment and maintenance of processes and policies that ensure the Bank is in compliance with the laws and regulations that apply to it as well as its own policies, including:

- reviewing with management the Bank's compliance with applicable regulatory requirements and the regulatory compliance management processes;

- establishing procedures in accordance with regulatory requirements for the receipt, retention and treatment of complaints received by the Bank on accounting, internal accounting controls or auditing matters, and receiving reports on such complaints and submissions as required under the applicable policy;

- reviewing an annual report from the Chief Risk Officer regarding examinations of the Bank conducted by OSFI, and following up with management on the status of recommendations and suggestions, as appropriate; and

- reviewing professional pronouncements and changes to key regulatory requirements relating to accounting rules to the extent they apply to the financial reporting process of the Bank.

\*\*\*

**NON-INTEREST INCOME**

Non-interest income for the year on a reported basis was $12,702 million, an increase of $325 million, or 3%, compared with last year. Adjusted non-interest income for the year was $12,713 million, an increase of $616 million, or 5%, compared with last year. The increase in adjusted non-interest income was primarily driven by increases in the U.S. Retail, Canadian Retail, and Wholesale Banking segments, partially offset by the Corporate segment. U.S. Retail non-interest income increased primarily due to the contribution from Nordstrom and the impact of foreign currency translation, partially offset by lower gains on sales of securities. ***Canadian Retail non-interest income increased primarily due to wealth asset growth, higher personal and business banking fee-based revenue***, and insurance premiums, partially offset by the impact of a change in mix of reinsurance contracts. Wholesale Banking non-interest income increased primarily due to strong debt underwriting fees and corporate lending growth. Corporate segment non-interest income decreased primarily due to the gains on sales of TD Ameritrade shares in the prior year.

\*\*\*

**RISK CULTURE**

The Bank's risk culture embodies the "tone at the top" set by the Board, Chief Executive Officer (CEO), and Senior Executive Team (SET), which informs TD's vision, mission, guiding principles, and leadership profile. These governing objectives describe the attitudes and behaviours that the Bank seeks to foster, among its employees, in building a culture where the only risks taken are those that can be understood and managed. ***TD's risk culture promotes accountability, learning from past experiences, and encourages open communication and transparency on all aspects of risk taking. TD employees are encouraged to challenge and escalate when they believe the Bank is operating outside of its risk appetite.***

***Ethical behaviour is a key component of TD's risk culture. TD's Code of Conduct and Ethics guides employees and Directors to make decisions that meet the highest standards of integrity, professionalism, and ethical behaviour. Every TD employee and Director is expected and required to assess business decisions and actions on behalf of the organization in light of whether it is right, legal, and fair.*** TD's desired risk culture is reinforced by linking compensation to management's performance against the Bank's risk appetite. Performance against risk appetite is a key consideration in determining compensation for executives, including adjustments to incentive awards both at the time of award and again at maturity for deferred compensation. An annual consolidated assessment of management's performance against the RAS prepared by Risk Management and reviewed by the Risk Committee is used by the Human

Resources Committee as a key input into compensation decisions. All executives are individually assessed against objectives that include consideration of risk and control behaviours. This comprehensive approach allows the Bank to consider whether the actions of executive management resulted in risk and control events within their area of responsibility.

(Emphasis added.)

22.    The 2015 40-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by  Defendants Masrani and Johnston, stating that the financial information contained in the 2015 40-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

23.    On December 1, 2016, TD Bank filed an annual report on Form 40-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended October 31, 2016 (the "2016 40-F").  For the quarter, the Company reported net income of $2.27 billion, or $1.20 per diluted share, on revenue of $8.74 billion, compared to net income of $1.81 billion, or $0.96 per diluted share, on revenue of $8.04 billion for the same period in the prior year.  For 2016, the Company reported net income of $8.82 billion, or $4.67 per diluted share, on revenue of $34.31 billion, compared to net income of $7.91 billion, or $4.21 per diluted share, on revenue of $31.42 billion for 2015.

24.    In the 2016 40-F, the Company stated in relevant part:

**Business Conduct and Ethical Behaviour**

The Committee shall monitor compliance with policies in respect of ethical, personal and business conduct, including the Bank's Complaint-Handling and Disclosure of Information to Customers Policy; Anti-Bribery and Anti-Corruption Policy; and Code of Conduct and Ethics and the conflicts of interest procedures included therein, including approving, where appropriate, any waiver from the Bank's Code of Conduct and Ethics to be granted for the benefit of any director or executive officer of the Bank.

**Compliance**

The Committee shall oversee the establishment and maintenance of processes and policies that ensure the Bank is in compliance with the laws and regulations that apply to it as well as its own policies, including:

• reviewing with management the Bank's compliance with applicable regulatory requirements and the Regulatory Compliance Management (RCM) Program;

• establishing procedures in accordance with regulatory requirements for the receipt, retention and treatment of complaints received by the Bank on accounting, internal accounting controls or auditing matters, and receiving reports on such complaints and submissions as required under the applicable policy;

• reviewing professional pronouncements and changes to key regulatory requirements relating to accounting rules to the extent they apply to the financial reporting process of the Bank; and

• acting as the Board's compliance oversight committee in respect of the Volcker Rule within the Dodd-Frank Wall Street Reform and Consumer Protection Act (U.S.), including receiving reports, at least annually, from senior management and control functions on the effectiveness of and compliance with matters relating to the TDBG Enterprise Written Volcker Compliance Program.

***

**NON-INTEREST INCOME**

Reported non-interest income for the year was $14,392 million, an increase of $1,690 million, or 13%, compared with last year. All segments experienced increases in reported non-interest income. Wholesale Banking non-interest income increased due to higher trading revenue and fees. Corporate segment non-interest income increased primarily due to the contribution from an acquisition in the strategic cards portfolio and higher revenue from treasury and balance sheet management activities, partially offset by a lower gain due to change in the fair value of derivatives hedging the reclassified available-for-sale securities portfolio, which was reported as an item of note. ***The increase in Canadian Retail non-interest income reflected wealth asset growth and higher personal and business banking fee-based revenue.*** U.S. Retail non-interest income increased primarily due to fee income growth in personal banking, the positive impact from an acquisition in the strategic cards portfolio, and the favourable impact of foreign currency translation, partially offset by a change in time order posting of customer transactions and an unfavourable hedging impact. Adjusted noninterest income for the year was $14,385 million, an increase of $1,672 million, or 13%, compared with last year.

***

**RISK CULTURE**

The Bank's risk culture embodies the "tone at the top" set by the Board, Chief Executive Officer (CEO), and Senior Executive Team (SET), which informs TD's vision, mission, guiding principles, and leadership profile. These governing objectives describe the attitudes and behaviours that the Bank seeks to foster, among its employees, in building a culture where the only risks taken are those that can be understood and managed. ***TD's risk culture promotes accountability, learning from past experiences, and encourages open communication and transparency on all aspects of risk taking. TD employees are encouraged to challenge and escalate when they believe the Bank is operating outside of its risk appetite.***

***Ethical behaviour is a key component of TD's risk culture. TD's Code of Conduct and Ethics guides employees and Directors to make decisions that meet the highest standards of integrity, professionalism, and ethical behaviour. Every TD employee and Director is expected and required to assess business decisions and actions on behalf of the organization in light of whether it is right, legal, and fair.*** TD's desired risk culture is reinforced by linking compensation to management's performance against the Bank's risk appetite. Performance against risk appetite is a key consideration in determining compensation for executives, including adjustments to incentive awards both at the time of award and again at maturity for deferred compensation. An annual consolidated assessment of management's performance against the RAS prepared by Risk Management and reviewed by the Risk Committee is used by the Human Resources Committee as a key input into compensation decisions. All executives are individually assessed against objectives that include consideration of risk and control behaviours. This comprehensive approach allows the Bank to consider whether the actions of executive management resulted in risk and control events within their area of responsibility.

(Emphasis added.)

25.    The 2016 40-F contained signed certifications pursuant to the SOX by Defendants Masran and Ahmed, stating that the financial information contained in the 2016 40-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26.    The statements referenced in ¶¶ 20-25 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.

Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's wealth asset growth and increased fee-based revenue was spurred by a performance management system that led to its employees breaking the law at their customers' expense in order to meet sales targets; (ii) the Company illicitly increased customers' lines of credits and overdraft protection amounts without their knowledge; (iii) the Company illicitly upgraded customers to higher-fee accounts without permission; (iv) the Company lied to customers as to the risk of the Company's products and services; and (iv) as a result of the foregoing, TD Bank's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

27.     On March 6, 2017, *CBC News* first reported about the pressures put on TD Bank branch employees for products they do not need. *CBC News* interviewed several TD Bank Group employees, who spoke about the "incredible pressure" to "squeeze profits from customers by signing them up for products and services they don't need."  The report stated in relevant part:

> Go Public [CBC News Public Forum] has heard from TD tellers in several Canadian cities who say they quit their jobs because the pressure to push products was so extreme.
>
> ***"I was made to feel as if I was committing a huge wrong for looking out for the best interests of my customer over the interests of the bank," says Dalisha Dyal, who worked as a TD teller in Vancouver for four years.***
>
> Another TD teller says the relentless pressure to meet sales numbers is so severe, the teller is currently on a medical leave.
>
> **Teller screens highlight potential sales**
>
> The three bank employees who initially contacted Go Public explained how tellers upsell customers: when a customer keys in a PIN at the teller counter, a gold star lights up on the teller's computer screen, indicating that "Advice Opportunities Exist."

When a teller clicks on the star, products and services the customer hasn't purchased pop up, such as overdraft protection, credit card or line of credit.

Each time a teller gets a customer to sign up for one of those options, it counts towards meeting their sales targets.

"Customers are prey to me," says the teller. "I will do anything I can to make my [sales] goal."

                    \*\*\*

The TD employees say elderly customers are a common target because they've grown to trust their tellers over the years.

"There are elderly customers who have fought for us — they have an army pension," says the teller. "And here I am, setting them up with all these service fees and they don't have a clue what's going on."

Both the managers sometimes work the front counter and say there's a big push by their branch manager to sign up people for overdraft protection, so sometimes clients with large balances get it, too.

"Customers pay enough in service charges," says one manager. "They shouldn't have to worry ... 'What has my teller added to my profile today?'"

**'More pressure on us'**

***"The higher-ups are also putting more pressure on us to get tellers to achieve these goals," says the other manager.***

"And if they don't … our job is to make sure that they understand that they're no longer right for this job."

"I feel bad for what they're making me do," she says.

***When the managers expressed concerns to their branch manager and district vice-president, they say they were asked to consider whether they were still "a good fit" for the job.***

Documents obtained by Go Public show tellers who fail to reach their sales goals are called "underperformers" and placed on a "Performance Improvement Plan," which involves daily coaching and monitoring by managers. If sales performance doesn't improve, employees are warned "employment could be terminated."

(Emphasis added.)

28.     On March 10, 2017, *CBC News* published a more detailed second report, where it reported that hundreds of current and former employees responded to the first CBC report with stories of pressure to upsell customers, stating in relevant part:

> Hundreds of current and former TD Bank Group employees wrote to Go Public describing a pressure cooker environment they say is "poisoned," "stress inducing," "insane" and has "zero focus on ethics."
>
> ***Some employees admitted they broke the law, claiming they were desperate to earn points towards sales goals they have to reach every three months or risk being fired. CBC has agreed to conceal their identities because their confessions could have legal ramifications.***
>
> TD insists all its employees are to follow the company's code of ethics, but many employees who contacted Go Public said that's impossible to do given the sales expectations.
>
> ***"I've increased people's lines of credit by a couple thousand dollars, just to get SR [sales revenue] points," said a teller who worked for several years at a TD branch in Windsor, Ont.***
>
> ***He admits he didn't tell the customers, which is a violation of the federal Bank Act.***
>
> ***Another teller with over 20 years' experience at an Ontario TD branch said she has increased customers' overdraft protection amounts without their knowledge, and increased their TD Visa card limits on the sly — all to earn units towards her sales revenue target.***
>
> Many TD workers wrote to say they are on medical leave, suffering from anxiety and/or depression because of the constant pressure to upsell customers.
>
> One teller on sick leave described how a manager stood behind her three times a day, pushing her to sell more.
>
> "They just really stress you out and say, 'You're not doing good. I need you to do double the amount you've been doing.' I couldn't sleep. I'd be thinking … 'What can I do tomorrow to try and get sales?'"
>
> ***She admits to upgrading customers to a higher-fee account without telling them.***
>
> "Because that gives us sales revenue. And the customers don't have to sign for it."
>
> **'I wouldn't have noticed the $29.95'**

Bev Beaton believes she's been a victim of a TD teller desperate to generate sales revenue.

In January, she noticed a service charge on her account for $29.95. When she called TD to ask about it, she was told it was because she was in an account that required her to keep a minimum monthly balance of $5,000 or she would be charged that monthly fee.

*"I said, 'I did not ask for this account. There's no way I would have asked for this account.' And [the bank employee] said, 'You must have.'"*

When Beaton checked her statements, she saw that she'd been moved to the higher-fee account last May, but only noticed when her balance dropped below $5,000 for the first time in December and she was hit with the service charge.

"I was very annoyed," Beaton said. "And I think it's dishonest. Because if I wasn't looking at my statement closely, I wouldn't have noticed the $29.95."

**Financial advisers also admit deceit**

*TD employees tell Go Public the pressure to deceive customers extends beyond front-line staff to workers handling wealth management.*

"We do it because our jobs are at stake," said one financial adviser in Ontario.

She admits she acted in her own interest rather than that of her clients after being put on a Performance Improvement Plan — a program that involves coaching and could result in termination of employment — because she wasn't meeting her sales targets.

*"I have invested clients' savings into funds which were not suitable, because of the SR [sales revenue] pressure," she said.* "That's very difficult to admit. I didn't do this lightly."

**'I was forced to lie to customers'**

A former TD financial adviser in Calgary says he would downplay the risk of products that gave him a big boost towards his quarterly goal.

*"I was forced to lie to customers, just to meet the sales revenue targets," he said.*

*"I was always asked by my managers to attach unnecessary products or services to the original sale just to increase the sales points — and not care if the customer can afford it or not."*

A financial adviser who worked for six years in Nanaimo, B.C., before quitting says "people eventually snap, or lose all sense of themselves and do anything to close sales."

"I have had multiple conversations with branch and district managers. These conversation lead to my being asked if I was still the right fit for the job."

**Employees must abide by code of ethics: TD**

In statement provided to Go Public, TD spokesperson Daria Hill wrote every employee must "act ethically and ... not allow a focus on business results to come before our focus on customers."

In an internal letter written to TD employees and obtained by Go Public, Andy Pilkington, executive vice-president of branch banking, wrote, "We don't believe the [CBC] story is an accurate portrayal of our culture," but said the report was an opportunity "to pause, reflect and ask ourselves ... how we can do better for our people and our customers."

One TD teller balked at Pilkington's letter, sending an email to Go Public that says, "Maybe if they stood back for a moment and thought about how they have put so much pressure on employees (with ridiculous sales goals) they wouldn't be in this situation right now!"

(Emphasis added.)

29.     On this news, TD Bank's share price fell $2.74, or 5.29%, to close at $49.03 on March 10, 2017.

30.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

<u>**PLAINTIFF'S CLASS ACTION ALLEGATIONS**</u>

31.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TD Bank securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TD Bank securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by TD Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TD Bank;

- whether the Individual Defendants caused TD Bank to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of TD Bank securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

37.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- TD Bank securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold TD Bank securities between the time the defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

38.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

39.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

40.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

42.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TD Bank securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire TD Bank securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

43.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for TD Bank securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about TD Bank's finances and business prospects.

44.      By virtue of their positions at TD Bank, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

45.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers

22

and/or directors of TD Bank, the Individual Defendants had knowledge of the details of TD Bank's internal affairs.

46.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of TD Bank.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TD Bank's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TD Bank securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning TD Bank's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired TD Bank securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

47.     During the Class Period, TD Bank securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TD Bank securities at prices artificially inflated by defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff

and the Class, the true value of TD Bank securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of TD Bank securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

48.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

49.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

50.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

51.     During the Class Period, the Individual Defendants participated in the operation and management of TD Bank, and conducted and participated, directly and indirectly, in the conduct of TD Bank's business affairs.  Because of their senior positions, they knew the adverse non-public information about TD Bank's misstatement of income and expenses and false financial statements.

52.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to TD

Bank's financial condition and results of operations, and to correct promptly any public statements issued by TD Bank which had become materially false or misleading.

53.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which TD Bank disseminated in the marketplace during the Class Period concerning TD Bank's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause TD Bank to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of TD Bank within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TD Bank securities.

54.     Each of the Individual Defendants, therefore, acted as a controlling person of TD Bank.  By reason of their senior management positions and/or being directors of TD Bank, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, TD Bank to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of TD Bank and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

55.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TD Bank.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 15, 2017

**LITE DEPALMA GREENBERG, LLC**

*/s/ Bruce D. Greenberg*
570 Broad Street – Suite 1201
Newark, New Jersey 07102
Telephone: 973-623-3000
Facsimile: (973) 623-0858
Email: bgreenberg@litedepalma.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*